In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00167-CV**
_____

**QUADVEST, L.P. AND WOODLAND OAKS UTILITY, L.P.,**
**Appellants**

**V.**

**SAN JACINTO RIVER AUTHORITY, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-08-10189-CV**

**MEMORANDUM OPINION**

In a permissive interlocutory appeal, Quadvest, L.P. and Woodland Oaks Utility, L.P. (collectively, the Utilities) seek to reverse the trial court's ruling granting the San Jacinto River Authority's Motion for Partial Traditional Summary Judgment. In its ruling, the trial court determined that the Utilities did not have the right to assert certain affirmative defenses to the SJRA's breach of contract claim for payment

1

under the decades-long contracts the parties executed in 2010, which the SJRA used to secure the repayment of its debt in return for the sale of seven series of outstanding bonds. In granting the SJRA's motion, the trial court concluded that, under the statutes that applied to the SJRA's bonds, the legislature made the validity of a local governmental entity's contracts pledged to secure a debt obligation and approved through the process required by these statutes "incontestable in a court or other forum."[1]

The Utilities appeal from that ruling and, in their brief, they raise two appellate issues for our review. First, the Utilities argue that when it passed the statutes applicable to the SJRA's contracts and bonds, the legislature did not intend to strip entities that execute contracts with local governmental entities of their right to raise defenses that challenge the validity or the enforceability of the contracts on which a local governmental entity's claims are based. Second, the Utilities argue that by interpreting the statutes that apply to the SJRA's bonds in a manner that prevents them from defending against the SJRA's breach of contract

---

[1]Tex. Gov't Code Ann. §§ 1202(a); 1371.059(a) (Supp); Texas Water Code Ann. § 49.184(b).

2

claim on the ground that their contracts with the Utilities should be set aside as unenforceable or void, the trial court gave the statutes an interpretation that violates their constitutional rights under the separation of powers doctrine, the open courts provision, the due course of law clause under the Texas Constitution, and the right to Due Process under the United States Constitution.[2]

The summary-judgment evidence established that the SJRA's contracts with the Utilities were submitted and approved by the Texas Attorney General and registered with the Comptroller's Office. That is the process the legislature created to make contracts pledged by local governmental entities *incontestable* according to their terms for contracts that local governmental entities have pledged to secure the payment of the debt on their bonds. Furthermore, the terms of the parties' contracts do not make the validity of the contracts contestable based on the affirmative defenses that the Utilities raised to the SJRA's claim for payment that are the subject of the SJRA motion for summary judgment. Rather, in the contracts the parties executed, they included specific

---

[2]Tex. Const. art. I, § 13 (Open Courts); Tex. Const. art. I, § 19 (Due Course of Law); U.S. CONST. amend. XIV, § 1 (Due Process).

provisions setting out the remedies that were to be available to a party should a party default on its obligations under its contract. Those provisions don't include a provision in which the Utilities reserved a right to assert a claim that the contracts are either unenforceable or void.

The legislature made contracts pledged by local governmental units "incontestable" once they were approved in the required statutory authorization process, a process that no one disputes occurred here. The terms of the contracts the Utilities signed also include no provisions expressly reserving to the Utilities any right to assert a defense on the theory that the contracts are unenforceable or void. For those reasons as further explained below, we conclude the trial court did not err in granting the SJRA's motion.

## Background

Simply put, this dispute is largely about the legislature's intended meaning of the term *incontestable* in the three statutes that the parties point to in their brief, which all parties agree apply to the Utilities' bonds and their contracts.[3] In these statutes, the legislature didn't specifically

---

[3]Tex. Gov't Code Ann. § 1202.006 (Validity and Incontestability), § 137.059 (Validity and Incontestability); Tex. Water Code Ann. § 49.184(c)

4

define the meaning of the word *incontestable*.[4] Once we decide what that term means, we must look to the terms of the contracts to determine whether the defenses on which the trial court granted the SJRA's motion were reserved or waived.

For the purposes of this appeal, we will call the three statutes that apply to the Utilities' bonds and contracts the bond-approval statutes.[5] In the trial court and on appeal, the Utilities argue that the bond-approval statutes make the bonds incontestable by a local governmental entity, but the statutes do not make the contracts pledged by the local governmental entity to back its repayment of its debt on the bonds incontestable as against those that signed the contracts that represent the security for the SJRA's repayment of its debt.

The Utilities are privately-owned companies that provide water to customers in Montgomery County by selling them groundwater, which they pump from the Gulf Coast Aquifer for a profit.[6] That said, the Utilities are just two of the many large-volume groundwater users that

---

(providing that a contract pledged to the payment of a bond once submitted and approved by the attorney general "shall be incontestable").

[4] *Id.*

[5] *Id.*

[6] *See* Tex. Water Code Ann. § 36.002.

5

have historically relied on groundwater in Montgomery County for the water they supply to their customers. As the population in Montgomery County has grown, so have concerns about the extent to which large-volume groundwater users have relied on groundwater drawn from the Gulf Coast Aquifer for their supplies. In 2001, the legislature created the Lone Star Groundwater Conservation District (the Conservation District) to address that concern.[7] Under the Texas Water Code, the legislature gave water conservation districts the power to "make and enforce rules . . . to provide for conserving, preserving, protecting, and recharging of the groundwater or of a groundwater reservoir . . . in order to control subsidence, prevent degradation of water quality, or prevent waste of groundwater and to carry out the powers and duties provided by this chapter[,]" Texas Water Code Chapter 36.[8]

Seven years after it was created, the Conservation District required all large-volume groundwater users to develop and implement plans designed to reduce their groundwater use. Yet under the Conservation

---

[7]*See* Act of May 28, 2001, 77th Leg., R.S., ch. 1321, 2001 Tex. Gen. Laws 3246-3250; Tex. Water. Code Ann. §§ 36.001 (Definitions), 36.011 (Method of Creating District); *see also City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 448 (Tex. 2020).

[8]Tex. Water Code Ann. § 36.101(a) (Rulemaking Power).

District's plan, mandatory cutbacks in groundwater use were delayed until January 2016.[9] Still, large groundwater users could either establish plans of their own to reduce their groundwater use or they could join with other large groundwater users to reduce their use as a combined group to comply with the Groundwater District's plan. The Groundwater District's plan didn't immediately force large-volume groundwater users to reduce the extent to which they were relying on their wells and water from the Gulf Coast Aquifer since the Groundwater District's plan didn't require mandatory cutbacks in groundwater use until 2016. But beginning in 2016, the Groundwater District planned to assess penalties should large-volume groundwater users fail to meet the cutbacks required by its plan.

In Montgomery County, another local governmental entity created by the legislature—the SJRA—has regulatory authority over the surface water from the San Jacinto River. The legislature created the SJRA in 1937 to "control and coordinat[e] [] the regulation of the waters of the watershed of the San Jacinto River and its tributaries." After the Groundwater District created its plan, the SJRA presented large-volume

---

[9] *See City of Conroe*, 602 S.W.3d at 448.

groundwater users with a possible solution to complying with the Groundwater District's regulatory plan by signing onto a project designed to raise money to build treatment plants to treat surface water from Lake Conroe (part of the San Jacinto River system) that were to be built with funds from bonds sold by the SJRA secured by contracts signed by large-volume water users like the Utilities. These contracts were called Groundwater Reduction Planning Contracts (GRP Contracts).

Under their GRP Contracts, the Utilities were to receive groundwater credits to offset their production of groundwater based on the SJRA's overall plan, which allowed the large-volume groundwater users to reduce their groundwater use as a group. Additionally, the terms of the GRP Contracts provide the Utilities with a right in the future to purchase surface water treated in the treatment plant the SJRA was planning to build, but only when and if the Utilities were connected to the completed water treatment system.

In 2010, the Utilities had three main incentives for executing the GRP Contracts. First, by joining with other large-volume groundwater users to back the SJRA's project, the Utilities and other large-volume groundwater users enabled the SJRA to collateralize bonds so that it

8

could fund a project to build the infrastructure required to provide the citizens of Montgomery County with an alternative to the Gulf Coast Aquifer as a source of their water supply. Second, when the mandatory groundwater cutbacks took effect in future years, the Utilities obtained a right to receive groundwater credits that would offset obligations they had to the Groundwater District under the Groundwater District's regulations to reduce their groundwater use. Third, by signing the GRP Contracts, the Utilities were relieved of the obligation they otherwise would have had to develop groundwater reduction plans of their own under the Groundwater District's plan. The GRP Contracts required the Utilities to pay "pumpage fees," and the pumpage fees were one of the primary revenue streams that came from the contracts of the large-volume groundwater users as a group that the SJRA relied on to support the payments required to pay its debt on the bonds that were sold to fund so that it could build the facilities needed for the water treatment project.

In 2010, the Utilities voluntarily executed the GRP Contracts with the SJRA. After the contracts were executed, the SJRA submitted them to the Attorney General pursuant to the bond-approval statutes for that

9

office's approval.[10] After the bonds and the contracts were reviewed and approved by that office, they were registered and certified by the Texas Comptroller of Public Accounts.

This same process was followed with other large-volume water users, including various cities and other utilities, which pump groundwater from wells in Montgomery County.[11] In all, the SJRA issued seven series of bonds between 2009 and 2016. The SJRA's GRP Contracts with around eighty large-volume grounder users were then used by the SJRA to collateralize the seven series of bonds that were sold by the SJRA to fund the project to build a treatment plant and systems related to that plant, which no one disputes were then built with bond funds. "For each bond series, the SJRA's Board of Directors adopted a resolution that authorized the bonds' issuance and delivery and that specified the bonds' purpose and terms. The resolutions pledged revenues from GRP water-sales and contracts to service the bond debt, maintain a bond reserve fund, and cover operation and maintenance expenses for the GRP

---

[10]*See* Tex. Gov't Code Ann. §§ 1202.003, .005-.006, 1371.057-.059; Tex. Water Code Ann. § 49.184.

[11]The summary-judgment evidence shows that the SJRA executed GRP Contracts with more than 80 entities including the cities of Conroe, Magnolia, and Splendora.

project."[12] As relevant here, the Utilities don't dispute that the proceeds from the sales of the bonds were used to build facilities that were then used to treat surface water from the San Jacinto River or its tributaries. There is also no dispute that the SJRA used the streams of revenue it received from the GRP Contracts over the ensuing years to service the debt on the bonds tied to the GRP Contracts.

In 2015, five years after they signed the GRP Contracts, the Utilities sued the Groundwater District and challenged the validity of the Groundwater District's regulatory rules that limited the volume of groundwater the Utilities could produce annually from their wells.[13] In September 2018, a judge sitting as a visiting judge in the 284th District Court in Montgomery County signed an order granting a motion for summary judgment in favor of the Utilities against the Groundwater District. In its Order, the trial court found that the rules of the Groundwater District limiting the Utilities' annual production of groundwater were created by the Groundwater District "without legal authority and consequently are, and have been, unlawful, void, and

---

[12]*City of Conroe*, 602 S.W.3d at 448.

[13]*See Lone Star Groundwater Conservation Dist. v. City of Conroe*, 515 S.W.3d 406 (Tex. App.—Beaumont 2017, no pet.).

unenforceable." The Groundwater District appealed from the Order, but the Groundwater District, the Utilities, and the other parties to that case (which didn't include the SJRA) settled the suit. Following the settlement, the parties then signed an agreed judgment. The agreed judgment in the suit against that Groundwater District states that the Groundwater District's regulations requiring reductions in groundwater usage "were adopted by [the Groundwater District] without legal authority and consequently are, and have been, unlawful, void, and unenforceable[.]"[14]

In 2019, the two Utilities that are parties to this appeal and four other privately owned water and sewer utility companies sued the SJRA, alleging that the SJRA had breached their GRP Contracts with the SJRA.[15] In the 2019 suit, the six utilities alleged that the SJRA derived its revenues from the GRP Contracts from two sources: (1) "pumpage

---

[14]*See Lone Star Groundwater Conservation Dist. v. City of Conroe*, No. 09-18-00383-CV, 2019 WL 611519 (Tex. App.—Beaumont Feb. 14, 2019, no pet.) (mem. op.) (dismissing an earlier appeal after the parties announced that they had settled, and the Final Judgment containing the language that we have quoted was signed by the trial court after the case was remanded to the trial court to allow the parties to complete their settlement).

[15]That suit was assigned Trial Court Cause Number 19-09-12611, and the district clerk assigned it to the 284th Judicial District Court.

fees" that they pay to the SJRA under the GRP Contracts, which for each utility is based on the amount of groundwater that each produces from the Gulf Coast Aquifer, and (2) the revenue stream that stems from the price the SJRA charges each utility for any surface water, if any, that the SJRA delivers to each utility. The petition alleged that under the GRP Contracts, the SJRA was required to set a pumpage fee at a rate that included "a reasonable allowance [among each of the groups of classifications the utilities plaintiffs were in for the] costs of operating and maintaining their Wells[,]" but that the SJRA had not complied "with its contractual obligation by making a reasonable allowance for those costs." By failing to calculate the pumpage fees properly, the Utilities alleged that the SJRA had breached the GRP Contracts and charged them rates that were not "just, reasonable, and non-discriminatory" in violation of section 6.04(b) of their contracts.

In 2020, the SJRA sued the Utilities, and that suit was also assigned to a visiting judge sitting in the 284th District Court. In its suit, the SJRA alleged that the Utilities executed the GRP Contracts, and that the bonds and contracts became incontestable under the bond-approval statutes upon their approval of the Texas Attorney General and their

13

registration by the Texas Comptroller. According to the petition, the Utilities were "more than 30 days past due on the GRP Contract fees for the months of May and June 2020, and stated their intention to continue breaching their GRP Contracts by refusing to pay any future amounts."

In response to the SJRA's suit, the Utilities filed a general denial, counterclaims, and affirmative defenses. While the Utilities' affirmative defenses and counterclaims overlap, their pleadings assert seven affirmative defenses, which claim the GRP Contracts: (1) lack consideration; (2) failed for a lack of consideration; (3) were executed due to a mutual mistake; (4) should be treated as illusory; (5) could not be enforced due to the SJRA's prior material breach; (6) should be rescinded based on the Montgomery County District Court's ruling against the Groundwater District finding its regulatory plan void and unenforceable; and (7) are avoidable because the contracts were fraudulently induced.[16]

Over two years after the SJRA sued the Utilities, it filed a Motion for Partial Traditional Summary Judgment. In its motion, the SJRA

---

[16]The Utilities' pleading also raises a claim that the contracts violate the federal anti-trust laws, but they haven't asked this Court to decide that issue. Instead, they state in their brief that this issue must "be first decided in the pending federal lawsuit between the parties."

claimed that, as a matter of law, the GRP Contracts are "incontestable" because the GRP Contracts were pledged by the SJRA as collateral to back bonds that it issued under the bond-approval statutes.[17] The SJRA argued that once the contracts and bonds were issued and approved under the bond-authorization process, the GRP Contracts didn't allow the Utilities to raise defenses to their breach of payment claim because the validity of the contracts became "incontestable in a court" under the language of these statutes since the contracts became "valid and binding obligations enforceable according to their terms."[18] So under the GRP Contracts the SJRA argued, the Utilities could not unilaterally terminate the contracts "as a result of a default by either Party," as the contracts state they may be terminated only after the Utilities execute an agreement "to pay [their] pro-rata share of the Bonds or other obligations [the SJRA] issued or incurred in connection with the Project[,]" which they did not do. Relying on the statute together with the language of the GRP Contracts, the SJRA asked the trial court to grant its motion for

---

[17]*See* Tex. Water Code Ann. § 49.184(e); Tex. Gov't Code Ann. §§ 1202.006(a), 1371.059(a).

[18]Tex. Gov't Code Ann. § 1371.059(a); *see also id*. § 1202.006(a); Tex. Water Code Ann. § 49.184(e).

summary judgment against the Utilities' as to the seven overlapping defenses they raised against the SJRA's breach of contract claim.

In response to the SJRA's Motion for Partial Summary Judgment, the Utilities argued the language in the bond-approval statutes doesn't preclude "contract defenses between contracting parties." Instead, the Utilities contend that these three statutes were intended to "function as a means of protecting government bonds from invalidation due to errors in their issuance or execution." The Utilities also claimed that if the bond-approval statutes operate as the SJRA's claims, the statutes are unconstitutional.[19] According to the Utilities, the SJRA's construction of the bond-approval statutes violates the separation of powers doctrine and the open courts provision of the Texas Constitution, as well as the due course of law clause and Due Process Clause of the Texas and United States Constitutions.[20] The Utilities argued that under the separation of powers doctrine, these statutes should not be interpreted in a way that

---

[19]We note that the SJRA does not argue that the bond-approval statutes prevented the Utilities from negotiating terms in the GRP Contracts that would have preserved one or more of the affirmative defenses that it made the subject of its motion for summary judgment.

[20]Tex. Const. art. II, § 1; *id.* art. I, § 13; *id.* art. I, § 19; U.S. CONST. amend. XIV, § 19.

16

allows the executive branch of government (through the Attorney General) to resolve "controverted property rights" when the right to resolve property rights is "vested in the judiciary." And under the open courts provision, the Utilities contended that these statutes should not be interpreted to bar them "from raising affirmative defenses to a contract claim." Finally, they argued that the Attorney General never gave them notice or an opportunity to participate in the statutory authorization process, which resulted in the Attorney General's approving the SJRA's bonds and contracts. Under the SJRA's interpretation of the bond-approval statutes, the Utilities conclude that it is deprived of "the most basic concepts of due process" if these statutes allow the Attorney General to adjudicate their property rights without giving them any notice or the opportunity to be heard.

The trial court rejected all the Utilities' arguments and decided that "as a matter of law the SJRA's GRP Contracts are incontestable, valid and enforceable according to their terms." The trial court also granted the Utilities' request for the trial court's permission to file an interlocutory appeal.[21] In its Order, the trial court identified three

_____

[21]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(d).

controlling questions of law on which there are substantial grounds for a

difference of opinion:

> (1) Whether the GRP Contracts are incontestable, valid and enforceable as a matter of law under Texas Government Code Section 1202.006, and if so, the scope of that incontestability.
> (2) Whether the GRP Contracts are incontestable, valid and enforceable as a matter of law under Texas Government Code Section 1371.059, and if so, the scope of that incontestability.
> (3) Whether the GRP Contracts are incontestable, valid and enforceable as a matter of law under Texas Water Code Section 49.184, and if so, the scope of that incontestability.

We subsequently exercised our discretion and accepted the appeal.[22]

## Standard of Review

We review summary judgments de novo.[23] "To prevail on

a traditional motion for summary judgment, the movant must show no

material fact issues exist and that it is entitled to judgment as a matter

of law." We take as true all evidence favorable to the party that opposes

the motion, and we indulge every reasonable inference and resolve any

doubts in favor of that party.[24]

---

[22]*Id.* § 51.014(f); *see also* Tex. R. App. P. 28.3.
[23]*Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022).
[24]*Id.*, Tex. R. Civ. P. 166a(c).

18

When a party that moves for summary judgment provides summary-judgment proof with its motion sufficient to establish that no genuine issue of material fact exist on at least one element of the claim on which it is seeking to obtain a summary judgment, "the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment" on that claim.[25] Evidence raises a genuine issue of material fact when reasonable and fair-minded jurors could differ in their conclusions after considering the summary-judgment evidence properly considered in the hearing.[26]

A trial court's interpretation of a statute is reviewed using a de novo standard.[27] When construing statutes, courts must determine and give effect to the legislature's intent.[28] Moreover, on appeal, the court should determine the intended meaning of a statute, if possible, from the

---

[25]*Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018).
[26]*Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).
[27]*See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655-56 (Tex. 1989).
[28]*See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000).

language in the statute being considered.[29] If the statute is not ambiguous, it is to be interpreted using its plain meaning.[30]

The parties' dispute centers on whether the legislature intended to allow the contracts pledged by a state agency to secure the repayment of its debt on a later date and after the bonds were sold and the contracts approved declared void. When deciding what the legislature intended, we read the words and phrases in a statute "in context and construe [them] according to the rules of grammar and common usage."[31] In construing the language of a statute, we construe each word so that each part of the statute has meaning and no part is left out.[32] We presume that each word in a statute was chosen "for a purpose," and that the legislature "purposely omit[ted] words" that it chose not to include.[33] "[W]hen a statute's words are unambiguous and yield but one interpretation, the

---

[29]*Id.*

[30]*See St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex. 1997).

[31]Tex. Gov't Code Ann. § 311.011.

[32]*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous.").

[33]*TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011).

judge's inquiry is at an end."[34] When the legislature chose not to define a word it used in a statue, we assume it intended for the courts to apply the common meaning when interpreting what the word means.[35]

## Analysis

*Did the trial court err in granting the SJRA's motion?*

Several facts were not disputed in the trial court, and they are undisputed in the appeal. For example, the Utilities don't dispute that the SJRA was authorized to issue the bonds, and they don't dispute that the SJRA and the Utilities "validly executed the GRP Contracts." Instead, the Utilities argue that they should be allowed to avoid paying the SJRA under their GRP Contracts because they aren't receiving the groundwater credits that they anticipated they would have received when they signed the contracts because following a decision in the Montgomery County District Court, the Groundwater District's Plan restricting their production of groundwater was declared void,

---

[34]*Rodriguez v. Safeco Ins. Co. of Indiana,* 684 S.W.3d 789, 793 (Tex. 2024) (cleaned up).

[35]*See* Tex. Gov't Code Ann. § 1.002 (Construction of Code); *id.* § 311.011(a) ("Words phrases shall be read in context and construed according to the rules of grammar and common usage.").

21

eliminating their need for the groundwater credits that they thought they might need when they signed the contracts in 2010.

The bond-approval statutes make both the bonds and the contracts pledged to secure them "incontestable" once they are approved by the Attorney General and registered with the Comptroller.[36] Texas Government Code section 1202.006(a) provides that:

> A public security and any contract the proceeds of which are pledged to the payment of the public security are valid and incontestable in a court or other forum and are binding obligations for all purposes according to their terms:
>
> > (1) after the public security is approved by the attorney general and registered by the comptroller; and
> >
> > (2) on issuance of the public security.[37]

Texas Government Code section 1371.059(a) provides:

> If proceedings to authorize an obligation or credit agreement are approved by the attorney general and registered by the comptroller, each obligation or credit agreement, as applicable, or a contract providing revenue or security included in or executed and delivered according to the authorizing proceedings is incontestable in a court or other forum and is valid, binding, and enforceable according to its terms.[38]

Finally, Texas Water Code section 49.184(e) provides:

---

[36]*See* Tex. Gov't Code Ann. §§ 1202.006(a), 1371.059(a); Tex. Water Code Ann. § 49.184(e).

[37]Tex. Gov't Code Ann. § 1202.006(a).

[38]*Id.* § 1371.059(a).

22

A contract or lease in which the proceeds of the contract or lease are pledged to the payment of a bond may be submitted to the attorney general along with the bond records, and, if submitted, the approval by the attorney general of the bonds shall constitute an approval of the contract or lease and the contract or lease shall be incontestable. A contract or lease, other than a contract or lease in which the proceeds of the contract or lease are pledged to the payment of a bond, may be submitted to the attorney general along with the bond records, and, if reviewed and approved by the attorney general, the approval of the bonds shall constitute an approval of the contract or lease and the contract or lease shall be incontestable.[39]

The Utilities argue that the term *incontestable* doesn't apply to all the parties to the contracts that the Attorney General approved, but only prevents the local governmental entity from challenging the validity of the contract that it signed. According to the Utilities, the legislature could not have intended to give *incontestable* a meaning that would strip those that execute contracts with local governmental entities that signed contracts approved under the bond-approval statutes of their affirmative defenses to a local governmental entities' breach of contract claim. According to the Utilities, the bond-approval statutes "address whether

---

[39]Tex. Water Code Ann. § 49.184.

the bond and related documents were validly executed" and were not intended to address "future contractual disputes."

The Legislature didn't specifically define the adjective *incontestable* in sections 1202.006(a) and 1371.059(a) of the Government Code, or in section 49.184(e) of the Water Code.[40] Webster's Dictionary defines *incontestable* as something "not subject to being disputed, called into question or controverted <~evidence> offering no grounds for doubt[.]"[41] The Utilities' argument is inconsistent with the plain meaning of the word incontestable. Clearly, if a contract could be challenged by one of the parties to the contract as invalid, the contract's validity would be in doubt.

The structure of the statutes reveal that the legislature intended the adjective *incontestable* to apply to both the contacts and the bonds. In sections 1202.006(a) and 1371.0059(a), the first subject of the sentences in these statutes refers to a debt instrument, referring to it as either a "public security," an "obligation," or a "credit agreement."[42] The second of

---

[40]Tex. Gov't Code Ann. §§ 1202.006(a), 1371.059; Tex. Water Code Ann. § 49.184(d).

[41]Incontestable, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1145 (2002).

[42]Tex. Gov't Code Ann. §§ 12002.006(a), 1371.059(a).

the two subjects describes the contracts, referring to them as "any contract the proceeds of which are pledged to the payment of the public security" or as "contract[s] providing revenue or security included in or executed and delivered according to the authorizing proceedings."[43] Thus, when we ask what the legislature made incontestable, these two statutes make the validity of both local governmental entities' bonds and contracts things that cannot be disputed once they are approved.

The structure of Water Code section 49.184(e) differs only slightly, as that statute makes a *contract* or *lease,* pledged by a local governmental entity to repay a debt, incontestable.[44] A separate subsection, subsection (d) of the Water Code, makes the bonds incontestable once they are approved by the Attorney General.[45] Thus under all three statutes, the bonds and the contracts are incontestable.

So we know what things are incontestable, but is it just the local governmental entity that cannot contest them as the Utilities argue, or both the local governmental entity and the party to a contract approved by the Attorney General that secured the local governmental entity's

---

[43]*Id.*
[44]Tex. Water Code Ann. § 49.184(e).
[45]*Id.* § 49.184(d), (e).

repayment of its debt? In our opinion, Government Code sections 1202.006(a) and 1371.059(a) answer that question. These statutes provide that the contracts "are binding obligations for all purposes according to their terms."[46] The Water Code, however, simply makes the contracts "incontestable" upon the attorney general's approval.[47]

We turn next to the language in the GRP Contracts to determine if the terms of the GRP Contracts reserved the affirmative defenses that were the subject of the SJRA's motion for summary judgment. The language in the agreements reveals that the Utilities knew that the contracts they were signing would be used by the SJRA to collateralize a series of bonds, which would be submitted by the SJRA for approval through the statutory process before selling them to the public. For instance, the language in the GRP Contracts the Utilities executed with the SJRA provides that the Utilities authorized the SJRA "to pledge, create one or more liens on, or assign all or any portion of the payments to be made by [that Utility] hereunder . . . to the payment and security

---

[46]Tex. Gov't Code Ann. § 1202.006(a), 1371.059(a).

[47]Tex. Water Code Ann. § 49.184(e). That said, the Water Code makes the bonds incontestable "in accordance with their terms for all purposes." *Id.* § 49.184(d).

for the Bonds issue by the Authority in order to finance or refinance the development of the GRP and/or the design, permitting, construction, operation, maintenance, or administration of the Project." The GRP Contracts include a force majeure clause, and that clause reflects that while the parties anticipated the possibility that a judicial action might suspend a parties' obligation under a GRP Contract, even a judicial action wouldn't suspend a party's obligation for the "payment of money." And last, the GRP Contracts include provisions that state: "This Contract may not be terminated as a result of a default by either party."[48] Thus, the terms of the contract reflect that the remedies that are ordinarily available in contract cases were unavailable to the parties under these contracts.

---

[48]Even though the contract is not subject to termination and even though the Utilities' obligations for payment under the agreements are enforceable as a matter of law, the GRP Contracts provide the Utilities with the right to sue the SJRA for damages they suffer to their streets, building, lights, trees, landscaping, etc. if those damages are caused by the SJRA or its contractors and for any "act or omission relating to the Authority's performance under this Contract[.]" In its brief, the SJRA refers to these as performance breach claims. As we understand the parties' arguments and in its motion for summary judgment, its motion and the trial court's ruling granting its motion doesn't include any claims reserved to the Utilities under the language in Article XI of the GRP Contracts.

That said, the parties included provisions in the GRP Contracts that provide express remedies in the case of a party's default. Under those provisions, the Utilities reserved some remedies, but not the defenses that are at issue in this appeal. For example, the Utilities reserved their right to sue the SJRA for damages should the SJRA or its contractors damage the Utilities' property when constructing any infrastructure on the Project. The Utilities also reserved their right to sue the SJRA for specific performance. The trial court's ruling on the SJRA's motion doesn't include these claims, which the SJRA's motion for summary judgment didn't raise. Moreover, nothing in the trial court's order prevents the Utilities from proving that they did not breach their contractual obligations to the SJRA.

In our opinion, the plain language of the bond-approval statutes and the structure of statutes reflects that their purpose was to assure that the purchasers of the bonds could rely on courts to enforce the contracts according to their terms against all parties to the contracts while at the same time preventing challenges being made to the underlying validity of the contracts themselves. By eliminating uncertainty, local governmental entities could sell bonds to the public at

28

lower rates than they would otherwise have obtained in a market without guaranteed contracts while gaining a benefit to the public in lower interest rates being charged to the local governmental entity for borrowing the funds.

To be clear, the trial court's ruling on the SJRA's motion for summary judgment didn't establish that the Utilities have breached their obligations under their GRP Contracts with the SJRA, nor does the trial court's ruling prevent the Utilities from presenting evidence in a trial to establish that the SJRA breached its obligations under the GRP Contracts to the Utilities by incorrectly calculating what the Utilities owe. All seven defenses addressed in the trial court's Order granting the SJRA's motion concern issues that involve defenses tied to whether the parties formed a valid contract or whether they signed GRP Contracts they knew the legislature made incontestable once approved by the Attorney General when the parties to the contracts did not include any language in their agreements reserving defenses to the underlying validity or enforceability of the contracts that they made. Because the SJRA established as a matter of law that the seven defenses that it made the subject of its Motion for Partial Summary Judgment lacked merit, we

conclude the trial court properly granted the motion. The Utilities' first issue is overruled.

*Are the bond-approval statutes unconstitutional?*

In its second issue, the Utilities argue that the construction the trial court placed on the bond-approval statutes renders the statutes unconstitutional. According to the Utilities, the SJRA's interpretation of the bond-approval statutes violates the separation of powers doctrine, a doctrine that prevents one branch of government from exercising a power belonging inherently to another.[49] As the Utilities see it, the state-agency bond-approval statutes take away the power that district courts have always had to adjudicate a party's common law defenses to breach of contract claims. They also argue that the statutes violate the open courts provision of the Texas Constitution and violate their rights to due process.

We disagree. The statutes simply make the contracts enforceable according to their terms. In the GRP Contracts, the Utilities didn't reserve their right to raise the defenses the SJRA challenged in its

---

[49]*See* Tex. Const. art. I, § 1, *see also Gen. Serv. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 600 (Tex. 2001); *Tex. Ass'n Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993).

motion for summary judgment. The language in the statutes making the contracts *incontestable* was part of the law when the parties signed the contracts. So under Texas law, those statues "form a part of [the contracts], as if they were expressly referred to or incorporated in their terms."[50] Consequently, after the contracts were executed, the Utilities are deemed to have agreed they would not contest the validity of the contracts in a court once the contracts were approved by the Attorney General and registered with the Comptroller.

Moreover, when the Utilities signed the GRP Contracts, they knew that the regulations of the Groundwater District, which governed their use of groundwater, were subject to change and subject to legal challenges. Yet they signed contracts that were incontestable without reserving the right to raise contract formation defenses or claim the contracts were void in the contracts they signed. For those reasons, the Utilities cannot now contest the validity of the GRP contracts regardless of whether the Groundwater District's regulations were later challenged in court, changed by the Groundwater District, or declared void.

---

[50] *City of Houston v. Williams*, 353 S.W.3d 128, 141 (2011) (cleaned up).

Even in their contracts, the Utilities recognized the possibility that through court action, the Groundwater District's regulations could be changed.[51] Yet in the section of the contracts recognizing that possibility, the Utilities gave the SJRA "the right, but not the obligation, to terminate the GRP Contracts."[52] The GRP Contracts do not include a corresponding provision allowing the Utilities a right to terminate the contracts should a regulation be changed. Instead, the GRP Contracts provide: "Except as provided above in this section, this Contract may only be terminated prior to the expiration of the contract Term by mutual, written agreement of the Parties." No party claims that an agreement to terminate the GRP Contracts has occurred.

Under Texas law, parties may "contract as they see fit as long as their agreement does not violate the law or public policy."[53] In their brief, the Utilities haven't cited any authority and did not argue that the agreements violate Texas law or public policy. In our opinion, it doesn't

---

[51]Section 12.02(b) of the GRP Contracts ("Accordingly, in the event of a change in any such law, rule, or regulation that would provide [the Utilities] Original Jurisdiction" over the raw water rates or reservation fees established by the SJRA"]).

[52]*Id.*

[53]*In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding).

violate public policy for a company to execute a contract to purchase groundwater credits to avoid the prospect of facing future penalties under a prospective regulatory scheme, even if that regulatory scheme is later challenged or changed by a regulatory authority or by a court.

By enacting Government Code sections 12.02.006(a), 1371.059(a), and Texas Water Code section 49.184(e), the legislature did not delegate to the Attorney General the power to adjudicate claims. Rather, the legislature gave the parties the right to reserve whatever they wanted to reserve in their agreements, but absent that made the validity of the contracts incontestable. Thus, by signing incontestable contracts and without reserving the defenses they raised to the SJRA's suit, the Utilities cannot challenge the validity of the GRP Contracts. If the Utilities had wanted to reserve that right, they could have negotiated for the right to do so in the GRP Contracts or chosen not to sign them. We overrule the Utilities' second issue.

## Conclusion

To sum it up: First, we hold the trial court did not err in granting SJRA's motion for partial summary judgment because the incontestability statutes expressly foreclose the right the Utilities' have

33

under the terms of their contracts to assert the seven categories of affirmative defenses that they raised. These seven defenses challenge the validity of the GRP Contracts but do so in violation of the incontestability provisions and under contracts that do not contain a provision reserving their right to raise a validity defense to the contract or a claim that the contract is void as a defense to a claim for payment. Second, we hold the Utilities have not established their claims that the bond-approval statutes violate the separation of powers doctrine, the open courts provision, the due course of law clause under the Texas Constitution, or the Due Process Clause.[54]

Accordingly, the trial court's Order Granting the Partial Traditional Summary Judgment is

AFFIRMED.

HOLLIS HORTON
Justice

Submitted on February 20, 2024
Opinion Delivered May 9, 2024

Before Golemon, C.J., Horton and Johnson, JJ.

---

[54]Tex. Const. art. I, § 13; *id*. art. I, § 19; U.S. CONST. amend. XIV, § 1.